Argued and submitted December 8, 1995, reversed and remanded May 29, petition for review denied October 8, 1996 (324 Or 305)

# Roy GOODMAN, Jr.,
*Respondent,*

*v.*

# CONTINENTAL CASUALTY CO.,
*Appellant.*

(9406-04195; CA A88824)

918 P2d 438

John R. Faust, Jr., argued the cause for appellant. With him on the briefs was Schwabe, Williamson & Wyatt.

Garry L. Kahn argued the cause for respondent. On the brief was Kathryn H. Clarke.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant Continental Casualty Co. appeals from the trial court's judgment that awarded plaintiff Roy Goodman damages on his action for breach of an insurance contract. We reverse and remand.

This case concerns a dispute over defendant's discontinuation of disability insurance benefits for injuries plaintiff suffered while working as a legal investigator in August 1968. The material facts are uncontroverted: Between 1955 and 1968, plaintiff was employed by a Portland law firm as a legal investigator. Between 15 and 20 percent of plaintiff's assignments involved investigating the circumstances of maritime-related personal injuries, which, on occasion, required him to climb into the lower holds of vessels.

Sometime before August 22, 1968, plaintiff purchased two policies of insurance from defendant. The first (policy #23596035) provided that defendant would pay benefits of $500 per month in the event that plaintiff was totally disabled as the result of "injury" or "sickness or disease." If plaintiff was disabled because of "injury," benefits would continue throughout his lifetime. If, however, disability was the result of "sickness or disease," benefits would terminate at age 65. That policy defined the operative terms as follows:

" 'Injury' means *bodily injury of the insured caused by an accident* occurring while this policy is in force and resulting directly and independently of all other causes in loss covered by this policy.

" 'Sickness' means sickness or disease of the insured contracted and commencing after this policy has been in force for not less than thirty days after its effective date and resulting in loss covered by this policy." (Emphasis supplied.)

In contrast to the first policy, the second (policy #5-A-5116) provided that, in the event of disability from either "injury" or "sickness or disease," plaintiff was to receive payments of (an additional) $200 a month for up to two years.

On August 22, 1968, after working a full day, plaintiff was contacted around midnight and asked to investigate

an accident involving a longshoreman who had been injured in the lower hold of a docked ship. Thereafter, plaintiff descended an 80-foot ladder into the vessel's hold, while carrying a 60-pound equipment bag. After completing his investigation, plaintiff ascended the ladder and, as he approached the top, experienced sudden and extreme chest pain, accompanied by sweating and weakness. He hung onto the ladder for a few minutes until he could maneuver himself over the edge of the ship hatch onto the deck. A doctor determined that plaintiff had suffered a heart attack. Ultimately, that incident rendered plaintiff totally disabled and prevented him from returning to work.

Plaintiff subsequently filed claims for disability benefits under both of the disability insurance policies defendant had issued. In filing those claims, plaintiff stated that his disabling condition was the result of an "injury." In response to plaintiff's claim under the second policy, defendant notified plaintiff that his claim for an "injury" had been given "favorable consideration." In addition, in response to plaintiff's claim under the first policy, defendant began to pay plaintiff $500 a month; in doing so, however, defendant did not either dispute or specifically accept plaintiff's characterization of his condition as resulting from an "injury."

Defendant paid plaintiff $500 per month under the first policy from 1968 until 1994.[1] In 1994, defendant discontinued the benefits, contending that the coverage had been for "sickness" and not "injury," and that, thus, benefits ended when plaintiff turned 65, in 1994.

Plaintiff brought this action, alleging that, because his on-the-job heart attack constituted an "injury," defendant had breached the parties' contract by terminating benefits at age 65, rather than continuing them throughout his lifetime. Plaintiff sought damages of $90,000, as well as attorney fees. The complaint did not plead estoppel, based on the parties' 26-year course of dealings.

At trial, defendant asserted that the question of whether plaintiff's heart attack was an "injury" within the

---

[1] It is unclear from the record whether defendant paid plaintiff benefits of an additional $200 per month for two years, as provided in the second policy.

meaning of the first policy was controlled by *Botts v. Hartford Accident & Indemnity Co.*, 284 Or 95, 585 P2d 657 (1978). In *Botts*, as amplified below, the court held that an on-the-job heart attack is "accidental" for purposes of disability insurance coverage if "the job-related activity leading to a victim's heart attack was abnormal and unusual, taking into consideration the ordinary requirements of his job performance." *Id.* at 103.

At trial, plaintiff introduced, *inter alia*, a copy of the first policy (#23596035) and copies of correspondence concerning plaintiff's claims under both policies and defendant's processing of those claims. Plaintiff did not, however, introduce a copy of the second policy (#5-A-5116).[2] Plaintiff was the only witness. In addition to describing the particular circumstances of the heart attack and defendant's subsequent payment of benefits, he offered the following testimony:

"Q. [By plaintiff's counsel] * * * Can you tell us with what frequency or infrequency you were required to climb onto a ship and go down into the lower hold of a ship?

"A. The accidents that occurred to the longshoremen occurred on various places of the ship. Of the 15 to 20 percent [of the] time that I was involved in looking into an accident on a ship—I couldn't give you a specific number of times because one could theoretically happen one day and one the next day—but for the frequency of happening in the lower hold, wasn't frequent. I was off on the main deck or on the next hold down, but for the very lowest hold of a ship it was certainly within the scope of what I did but it did not happen frequently.

"Q. Can you give us any educated estimate of how many times in a given year leading up to 1968 for the three or four years prior to that that you would have climbed 80 feet, approximately 80 feet down a ladder and back up out of a lower hold?

"* * * * *

"A. 12 to 18 times maybe.

"Q. Over a three or four-year period?

---

[2] Plaintiff had made a request for production from defendant of a copy of policy #5-A-5116, but defendant was unable to locate that policy in its files.

"A. Yes. Two or three times a year, four times a year.

"Q. But is was something that you occasionally did.

"A. Oh, certainly it was something I had to do.

"* * * * *

"Q. [By defense counsel] What you were doing during the early morning of August 22nd, 1968, was something that you had done a number of times before in your job. It wasn't unusual or out of the ordinary, was it?

"A. It was not unusual or out of the ordinary if you're talking about the scope of what I did. That was certainly usual for what I did. The frequency with which I did it was —I didn't do it frequently, not often.

"Q. You would consider it normal activity of your job, wouldn't you?

"A. I would consider it normal activity of my job."

After the close of evidence, the trial court expressed its belief that "the facts in this case are such that I cannot find that the activity was abnormal and unusual. It just simply wasn't based upon the testimony of Mr. Goodman and based upon the facts as presented in all of the evidence pertaining to the incident itself[.]" However, the trial court expressed concern about the fact that defendant had, in fact, paid benefits under the first policy for approximately 26 years, and invited further briefing on that issue.

The parties subsequently submitted post-trial memoranda.[3] Concurrently, plaintiff moved to reopen his case to introduce as an exhibit an excerpt of an insurance policy, which plaintiff asserted included operative terms and definitions that were identical to those of the missing second policy (#5-A-5116). Plaintiff contended that that exhibit showed that the definition of "injury" in the second policy was identical to the definition of "injury" in the first policy and, thus, that because defendant had accepted plaintiff's condition as

---

[3] Plaintiff's memorandum included a request, "in the event there is some technical deficiency in plaintiff's complaint," to amend the complaint to conform to evidence that, plaintiff asserted, supported a claim of estoppel. The trial court's ultimate disposition, see 141 Or App at 385, did not refer to that request.

an "injury" under the second policy, his condition was, necessarily, an "injury" for purposes of coverage under the first (now disputed) policy.

The trial court granted plaintiff's motion to reopen and, based in part on the newly proffered exhibit, held that defendant had breached the insurance policy. In so holding, the court concluded that *Botts* was materially distinguishable and that the parties' post-casualty course of dealing evinced a mutual understanding that plaintiff's condition was the result of an accidental "injury" within the first policy's coverage:

> "*Botts* is not determinative in this case. First, *Botts* was decided in 1978, ten years after benefits were first paid by the insurer under the policy in question. Second, *Botts* involved a dispute over death benefits which had yet to be paid, as compared to the instant case, where disability benefits had been paid for twenty-six years. Third, the nature of the job involved in *Botts* (road grading on a regular schedule for the state Highway Division) lends itself far more readily to the normal/abnormal, ordinary/unusual distinction than the job of a legal investigator which, of necessity, requires myriad tasks.

> "\* \* \* \* \*

> "Far more significant here is the intent of the parties as gleaned from their course of conduct before this dispute arose. More than a preponderance of the evidence established that the defendant treated the disability as resulting from accidental injury. Moreover, plaintiff considered his disability to be based on injury and assumed the company had treated it as such."

The trial court never ruled on plaintiff's request to amend the complaint to conform to evidence allegedly supporting a claim of estoppel.

■ On appeal, defendant raises two assignments of error. First, defendant asserts that the trial court improperly granted plaintiff's post-trial motion to reopen his case to submit the insurance policy exhibit. The bases of that assignment of error were not raised or preserved below, and the court's ruling in that regard does not constitute an error of law apparent on the face of the record. *Ailes v. Portland*

*Meadows, Inc.*, 312 Or 376, 823 P2d 956 (1991). Consequently, we do not consider it.

■    Defendant's second assignment of error challenges the trial court's central finding that plaintiff's heart attack was caused by an "injury," within the meaning of the first policy. That assignment argues, in turn, that: (1) The trial court erred in concluding that *Botts* was distinguishable; and (2) applying *Botts*, there is no evidence in this record from which the trial court, as trier of fact, could have found that the work activity leading to plaintiff's heart attack was "abnormal and unusual, taking into consideration the ordinary requirements of his job performance." 284 Or at 103.

We return to *Botts*. There, the insured died after suffering a heart attack while operating a grader for the State Highway Division. His widow sued to recover death benefits, contending that the heart attack was an "injury" within a group accident insurance policy. That policy defined "injury" as follows:

> "The word 'injury' * * * means accidental bodily injury sustained by an Insured Person or a Covered Dependent while the policy is in force with respect to such person and which results directly and independently of all other causes in loss covered by the policy." *Id.* at 98.

The trial court dismissed the plaintiff's claim, and the Supreme Court affirmed. The court canvassed various definitions of "accident" and "accidental" and observed that the propriety of any particular definition depends on context:

> "The problem arises from an erroneous impression that there is one all-encompassing definition of 'accident' or 'accidental' without regard to the particular factual circumstance in which the meaning of the term is brought into question. If someone is struck by lightening, his injury or death is usually spoken of as being the result of an unanticipated, external force or occurrence. If he walks across a field and steps in a hole, thereby breaking a leg, his injury is usually spoken of as being the unforeseeable and inadvertent result of his voluntary conduct. On the other hand, if one suffers a heart attack at work, it is asked whether the attack was the result of some unusual or abnormal conduct required of him in the performance of his job. The injury in

each case may be described as accidental, but no single definition of that word adequately covers all three situations." *Id.* at 102.

The court then proceeded to address the meaning of "accidental" in the context of on-the-job heart attacks:

"We see the issue in cases of on-the-job heart attacks which are covered by accident policies as being whether *the job-related activity leading to a victim's heart attack was abnormal and unusual, taking into consideration the ordinary requirements of his job performance.* We realize that we can be accused of substituting one abstraction for another and that 'abnormal' and 'unusual' are not much better than 'accidental' except that they are used in relation to the ordinary requirements of the job. After all, recognizing that words are slippery things at best, we have nothing else with which to convey ideas. However, as long as the 'reasonably prudent man' wanders in and out of halls of justice, it is difficult to condemn the use of abstractions in deciding cases.

"Whether the decision is for judge or jury follows the familiar pattern. In situations in which 'accident' or 'accidental' are not defined in the policy, it is for the court to decide the definition which is properly applicable to the particular factual situation, taking into consideration what we believe to be popular non-technical understanding of the term. * * *

"It is our conclusion that the facts do not demonstrate a situation sufficiently abnormal or unusual to make a jury question on whether decedent suffered an accidental injury resulting in death *as that term is understood by the ordinary purchaser of a policy.* * * *

"It can be argued that given the facts of the case, the word 'accident' is ambiguous and inexact and that the policy should therefore be construed against the company. There is a demand for accident policies, and the universal difficulty in attempting to pin down an exact meaning for the common understanding of what constitutes an accident in varying circumstances is hardly an adequate reason for saying that all cases of unforeseen results, even when we are sure they do not comport with the common understanding of 'accident' should be submitted to a jury." *Id.* at 103-04 (emphasis supplied).

Thus, *Botts*, although expressly acknowledging that a single, omnibus definition of "accidental" injury was unworkable and undesirable, *did* hold that that term has the same content in all cases involving on-the-job heart attacks. In that context, "accidental" injury is unambiguous. *Id.* at 104. Whether that general definitional standard is satisfied in any given case depends on the particular demands of the insured's job and the circumstances leading up to the heart attack. But *Botts'* standard—a standard derived from the *Botts* court's determination of the common understanding of the "ordinary purchaser of insurance"—remains constant.

**3.**     Given that understanding, we conclude that the trial court's bases for distinguishing *Botts* are unavailing. First, it is immaterial that *Botts* was decided 10 years after defendant began paying benefits, and an even longer period after the policies in this case were issued. Although we are loath to characterize *Botts*—or, indeed, any appellate decision—as "timeless," *Botts* was ultimately grounded in an objective analysis of what an ordinary purchaser of insurance would reasonably understand "accidental" injury to mean in the context of an on-the-job heart attack. 284 Or at 100; *accord Totten v. New York Life Ins. Co.*, 298 Or 765, 771, 696 P2d 1082 (1985) ("We interpret the terms of an insurance policy according to what we perceive to be the understanding of the common purchaser of insurance.") (citing *Botts*). In the absence of evidence that that common understanding of "accidental" injury changed between when plaintiff purchased his policies and 1972, when Botts purchased his policies, *Botts'* analysis applies equally to this case.[4] Consequently, there is no basis in this record for concluding that an objectively reasonable purchaser of insurance in 1968 or earlier would have understood "accidental" injury in the context

---

[1] Plaintiff points to *Mathel v. Josephine County*, 319 Or 235, 242, 875 P2d 455 (1994), as evincing an evolving understanding of whether an on-the-job heart attack is an "accidental" injury. In *Mathel*, the court held that "a heart attack, whether it is caused by physical exertion, by job stress, or by both, is an accidental injury within the meaning of ORS 656.005(7)." That holding, however, pertains solely to the proper construction of "accidental injury" for purposes of Oregon's Workers' Compensation Law and, particularly, to the legislative intent underlying that statute. *Mathel* did not refer to, much less purport to qualify or repudiate, *Botts*.

of work-related heart attacks to have a different content than that *Botts* ascribes.

Second, and similarly, the fact that defendant paid plaintiff benefits for 26 years after the casualty does not alter *Botts*' applicability. The parties' conduct in performing a contract is often, as the trial court recognized, persuasive evidence of a contract's meaning:

> "There is no more certain way of finding out what the contracting parties meant than to ascertain what they have actually done in carrying out the contract." *City Messenger Co. v. Postal Tel. Co.*, 74 Or 433, 441, 145 P 657 (1915).[5]

Nevertheless, courts can resort to such extrinsic evidence in construing contracts only if contractual language is ambiguous. *See Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347, 876 P2d 761 (1994) ("Unambiguous contracts must be enforced according to their terms; whether the terms of a contract are ambiguous is, in the first instance, a question of law."). In *Botts*, the court held that, in the context of on-the-job heart attacks, "accidental" injury is unambiguous. 284 Or at 104. That "matter of law" holding applies equally to the operative policy language here. Consequently, extrinsic evidence of the parties' course of performance was immaterial to construing the contract[6] and, thus, does not distinguish this case from *Botts*.

Third, differences between plaintiff's work here and the decedent's work in *Botts* do not affect the *applicability* of

---

[5] *Accord Tarlow v. Arntson*, 264 Or 294, 300, 505 P2d 338 (1973) ("How the original parties and their successors conducted themselves in relation to the agreement is instructive * * * of what must have been intended."); *Wood et al. v. Davin et al.*, 122 Or 74, 78-79, 257 P 690 (1927) ("This court should not interfere with the practical construction placed upon their contract by those people who well understood their own contract and acted upon it for more than twenty years.").

[6] Plaintiff argues that defendant's conduct—including accepting plaintiff's heart attack as an accidental injury under policy language that is identical to that at issue here and paying benefits for 26 years without disputing plaintiff's "injury" characterization—estops defendant from denying coverage. Assuming, without deciding, that that is true, that is a different basis of recovery than the breach of contract claim, which plaintiff pleaded and on which the trial court entered judgment.

the *Botts* standard. Instead, such differences go to the particular *application* of that standard—that is, whether work-related activity was "abnormal and unusual" must be determined by particular reference to the "ordinary requirements" of a given job. The "ordinary requirements" of tight rope walking are (at least arguably) different from those of appellate judging; nevertheless, *Botts* applies to both.

We thus conclude that *Botts* controls. Applying that formulation to this record, we further conclude that there is no evidence from which a reasonable trier of fact could conclude that the activity leading to plaintiff's heart attack was "abnormal and unusual, taking into consideration the ordinary requirements of his job performance." 284 Or at 103. Plaintiff candidly admitted as much in acknowledging that, although he did not frequently climb in and out of the lower holds of vessels, that activity was "normal activity of my job." Nothing in the record materially qualified, much less contradicted, that evidence. Consequently, the court erred in entering judgment for plaintiff.

Reversed and remanded.