Argued and submitted July 9, affirmed October 10, 2001, petition for review withdrawn January 2, 2002 (333 Or 205)

# WESTAR ELECTRIC COMPANY,
an Oregon corporation,
nka Wec Assets, Inc.,
*Respondent,*

*v.*

# WESTAR ACQUISITION CORP.,
an Oregon corporation,
nka Westar Dissolution Corp.,
*Appellant.*

9901-00193; A109590

33 P3d 718

Robert L. Aldisert argued the cause for appellant. With him on the briefs were Paul T. Fortino, Erick J. Haynie, and Perkins Coie LLP.

Jeffrey M. Batchelor argued the cause for respondent. With him on the brief were David B. Markowitz and Markowitz, Herbold, Glade & Mehlhaf, P.C.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

BREWER, J.

**BREWER, J.**

In this breach of contract action involving the sale of a business, defendant appeals from a judgment denying its motion for summary judgment and granting plaintiff's motion for summary judgment. The issues on appeal involve the application of established principles of contract interpretation. We review the summary judgment record to determine whether there is any genuine issue of material fact and whether either party was entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We affirm.

In 1996, defendant purchased Westar Electric Company (Westar or the business), a financially troubled electrical supply company, from plaintiff.[1] In consideration, defendant paid Westar's shareholders $224,405 in cash and assumed or paid off $5,377,115 of Westar's then-existing debts. To pay those debts, defendant borrowed funds from its parent company, North Pacific Lumber Company (North Pacific), which in turn borrowed the money from US Bank.

Three provisions of the parties' contract are relevant to this appeal. The first is Section 7.5, under which, if defendant sold the business within five years, plaintiff would receive as contingent consideration 100 percent of the "net proceeds"—up to a maximum payment of $1,600,000—less specified deductions, including certain capital invested by North Pacific, referred to as "Parent's Invested Capital." Section 7.5 provides:

> "In the event of a sale or other disposition of Buyer's business before June 30, 2001, Seller shall be entitled to receive payment in cash, within 60 days following such sale, of an amount equal to 100% of the *net proceeds* from the sale or disposition which exceed the sum of: (i) Parent's Invested Capital at the time of disposition; (ii) Buyer's cumulative after-tax net income; and (iii) an amount equal to 15% compounded each year of Parent's Invested Capital; provided, however, that the amount payable to Seller pursuant to this Section 7.5 *plus* the amounts paid pursuant to the other

---

[1] The transaction was structured as a sale of substantially all of the assets of the business.

provisions of this Section 7 shall not exceed $1,600,000." (First emphasis added; second emphasis in original.)

The contract does not define the term "net proceeds."

The second relevant provision is Section 7.1, which provides that plaintiff will receive a specified portion of any future net income earned by Westar over a five-year period, with a maximum payout of $1,600,000. Section 7 provides, in part:

"7.1 <u>Earn Out Formula</u>. The Contingent Consideration shall be paid to Seller for each of the five (5) years following the Effective Date based on the following formula (the 'Earn Out Formula'):

"7.1.1 For the period commencing at the Effective Date to December 31, 1996, if Buyer's after-tax annual net income exceeds 20% (on an annualized basis) of Parent's Invested Capital, Seller shall be paid an amount equal to 60% of such excess. For purposes of this Section 7.1, (i) Buyer's net income shall be assumed to include the results of financial performance of the business from the Effective Date to the Closing Date, (ii) Buyer's after-tax income shall be initially calculated based upon a tax rate of 38.5%, which rate shall be adjusted accordingly if statutory tax rates are changed subsequent to the date of this Agreement, (iii) 'Parent's Invested Capital' shall mean the purchase price paid or payable by Buyer as set forth in Section 8,[2] not including Contingent Consideration, *plus* the amount of debt repayment described in Section 1.4,[3] plus any borrowings deemed to be additional Parent's Invested Capital pursuant to Section 10.1, and (iv) no income or loss from any business other than the Business, including any division or department of such a business, acquired by [defendant] after the Closing Date shall be included in the calculation of [defendant's] after-tax net income or loss, it

---

[2] The parties agree that the purchase price, yielded by a formula established under Section 8, was $224,405.

[3] Section 1.4 provides, in part:

"1.4 <u>Tumpane Debt</u>. On the Closing Date, [defendant] shall pay in full, without prepayment penalty, the subordinated debt * * * in the principal amount of $385,138 owed by Seller to Jim Tumpane, Jr. For purposes of Section 7.1, Parent's Invested Capital shall include the principal amount of such debt."

being the intent that, for purposes of computing the Contingent Consideration, after-tax net income or loss of [defendant] shall be restricted to income derived from the Business and its internal growth.

"7.1.2    For each of the four years ending December 31, 1997, 1998, 1999 and 2000, and the period commencing January 1, 2001 and ending five years from the Effective Date, Seller shall be paid an amount equal to 60% of the excess of Buyer's after-tax annual net income for the given year, determined as set forth in Section 7.1.1 above, over the following amount: 20% (on an annualized basis) of Parent's Invested Capital *plus* 15% (on an annualized basis) of Parent's Share of Net Income. For purposes of this Section 7.1, (i) 'Parent's Share of Net Income' shall mean 20% (on an annualized basis) of Parent's Invested Capital for the year preceding such calculation *plus* Parent's Share of the Excess for each such preceding year, and (ii) 'Parent's Share of the Excess' shall mean the remainder (that is, 40%) of the excess amount on which Seller's 60% share has been calculated." (Emphasis in original.)

The third relevant provision is Section 10.1, which permitted North Pacific to designate as Parent's Invested Capital specified intercompany debt owed to it by defendant. Section 10.1 provides, in part:

"10.1    Working Capital Financing. After the Closing Date, [defendant] shall borrow funds to meet its working capital requirements from [North Pacific] * * *.

"* * * * *

"For calendar year 1997, [North Pacific] may elect to treat average borrowings with a term of twelve months or more where the leverage ratio exceeds 8.0:1.0 as additional Parent's Invested Capital for purposes of Section 7. For calendar years 1998 and 1999, [North Pacific] may elect to treat average borrowings with a term of twelve months or more where the leverage ratio exceeds 7.5:1 as additional Parent's Invested Capital for purposes of Section 7. For calendar years 2000 and thereafter, [North Pacific] may elect to treat average borrowings with a term of twelve months or more where the leverage ratio exceeds 7.0:1 may be considered as additional Parent's Invested Capital for purposes of

Section 7. Interest on borrowings deemed as additional Parent's Invested Capital shall be added back to [defendant's] income."

After the sale, defendant operated the business for nearly two years at a loss. During that time, defendant borrowed additional funds from North Pacific to meet operating expenses. North Pacific treated those advances as loans and defendant paid North Pacific interest on the debt. In 1998, defendant sold the business to Crescent Electric Company (Crescent). Crescent paid $4,185,111 in cash for the business, but did not assume any of defendant's indebtedness to North Pacific. Defendant used the cash proceeds of sale, plus funds of its own, to pay off its debts, including $4,278,583 in debt it then owed to North Pacific.[4] After the sale to Crescent, plaintiff demanded payment of $1,600,000 in contingent consideration from defendant under Section 7.5. Defendant refused to pay any contingent consideration to plaintiff, asserting that it was entitled to deduct all sums it owed to North Pacific in determining whether the sale to Crescent had resulted in any *net proceeds* under Section 7.5 in which plaintiff was entitled to share.

Plaintiff then filed this action for breach of contract. In its answer to plaintiff's complaint, defendant asserted that the sale to Crescent produced no net proceeds and that it did not owe plaintiff any contingent consideration under Section 7.5. Each party moved for summary judgment, arguing that there were no material issues of fact and that the disputed term "net proceeds" was unambiguous. However, the parties took opposing views of the term's meaning. Although the parties agreed that costs relating to the sale of the business should be deducted in calculating the net proceeds of sale, defendant argued that it also was entitled to deduct the intercompany debt it owed to North Pacific. Plaintiff responded that the contract does not permit the deduction of funds advanced to defendant by North Pacific, other than Parent's

---

[4] It is unclear from the record the extent to which that intercompany debt reflected sums that defendant had borrowed from North Pacific at the time defendant acquired the business from plaintiff or additional funds defendant borrowed after the acquisition, or some combination of both. For the reasons explained below, it is immaterial whether the intercompany debt existed at the time of the original acquisition or was accumulated thereafter.

Invested Capital, at the time of resale. The chart in the foot-note below contrasts the parties' views.[5]

The trial court concluded that the disputed term was ambiguous and also concluded that the parties had stipulated that the case did not present a material issue of fact. Based on that perceived stipulation, the trial court did not examine any extrinsic evidence in resolving the ambiguity. Rather, it concluded that it could resolve the ambiguity by applying maxims of construction. The trial court stated that "a contract term should be interpreted in the way reasonable business people would have intended the term had they contemplated its application to the dispute at hand at the time of contracting." It also concluded that reasonable business people would not deduct the amount used to pay off debt owed to North Pacific after the sale from the amount paid by Crescent. The trial court granted plaintiff's motion for summary judgment, entered judgment for plaintiff in the sum of $1,600,000 under Section 7.5, and denied plaintiff's motion to strike portions of the affidavits of two witnesses on the ground that it did not rely on any affidavits in making its ruling.

On appeal, defendant argues that (1) the contract unambiguously supports its interpretation and that the trial court erred in granting plaintiff's motion for summary judgment and denying its motion for summary judgment; (2) if the contract is ambiguous, extrinsic evidence demonstrates that defendant's interpretation is correct; and (3) in the alternative, the parties' conflicting affidavits present material

---

[5]

|  | Plaintiff | Defendant |
|---|---|---|
| Gross Proceeds | $4,185,111 | $4,185,111 |
| - Costs of Sale | 100,000 | 100,000 |
| - Repayment of Debt | 0 | 4,278,583 |
| = Net Proceeds | 4,085,111 | -193,472 |
| - Parent's Invested Capital | 609,543 | 609,543 |
| - Buyer's cumulative after-tax net income | 0 | 0 |
| -15% compounded return on Parent's Invested Capital | 172,263 | 172,263 |
| = Contingent Consideration | 3,303,305 | -975,278 |
| Amount due under Section 7.5 | $1,600,000 | $        0 |

issues of fact and thus summary judgment for either party is inappropriate.[6] Plaintiff responds that the trial court properly granted its motion for summary judgment, that the contract is unambiguous, and that extrinsic evidence should not be considered in interpreting it. In the alternative, plaintiff cross-assigns error to the denial of its motion to strike portions of the two affidavits. The decisive question is whether, in calculating the net proceeds of sale under Section 7.5, defendant was entitled to deduct the $4,278,583 used to repay the debt it owed to North Pacific upon the sale to Crescent.

There are three steps in interpreting a contractual provision. First, we examine the text and context of the provision, considering the contract as a whole, to determine whether the term is ambiguous. *Yogman v. Parrott,* 325 Or 358, 361, 937 P2d 1019 (1997). A provision of a contract is ambiguous if it can reasonably be given more than one meaning. *Pacific First Bank v. New Morgan Park Corp.,* 319 Or 342, 348, 876 P2d 761 (1994). Dictionary definitions may be used in the first step of the analysis to determine whether a provision is ambiguous. *Yogman,* 325 Or at 362. Second, if the provision is ambiguous, we examine extrinsic evidence of the intent of the parties. *Id.* at 363. Third, if the provision remains ambiguous, we apply maxims of construction to interpret it. *Id.* at 364. For the following reasons, we conclude that the disputed provision is not ambiguous and that the trial court was correct—albeit for a different reason than it gave—in granting plaintiff's motion for summary judgment.[7]

---

[6] In its fourth assignment of error, defendant argues that, if adopted by the court, plaintiff's interpretation would result in an unlawful forfeiture of defendant's rights under the agreement. Defendant further argues that the resale provision is a liquidated damages provision amounting to an unenforceable penalty. We reject those arguments without discussion.

[7] In *Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001), the Supreme Court explained the requirements for application of the "right for the wrong reason" principle. As will be apparent from the ensuing discussion, those requirements are satisfied here. First, the evidentiary record is sufficient to support the basis on which we affirm. Second, the decision of the trial court is correct for a reason other than that on which it relied. Finally, the reasons for the trial court's decision are unnecessary in light of the basis on which we affirm.

We first consider the ordinary meaning of the phrase "net proceeds." More precisely, we consider the meaning of "net," because the parties agree, for purposes of this case, that the term "proceeds" refer to the purchase price paid by Crescent to defendant for the business. *Webster's Third New Int'l Dictionary*, 1519 (unabridged ed 1993), defines "net" as "remaining after the deduction of all charges, outlay, or loss * * * ‹ ~ proceeds ›." That definition could refer—in keeping with plaintiff's theory—only to charges, outlays, or losses that are directly related to a resale of the business. Alternatively, it also could refer—as defendant suggests—to charges, outlays or losses that, although not related to a resale, are relevant to determine whether defendant actually gained or lost money on its overall investment in the business. Accordingly, the meaning of the contractual term cannot be ascertained from its dictionary definition alone. That definition is so broad and malleable that it fails to answer the question of whether intercompany debt owed to North Pacific—although not directly related to the sale to Crescent—nonetheless is a deductible "charge, outlay, or loss."

■ Our recognition of the insufficiency of dictionary definitions does not, however, conclude the first step of analysis. At that step, we also examine the term in the context of the contract as a whole. *Yogman*, 325 Or at 361. As noted, Section 7.5 expressly allows for the deduction of Parent's Invested Capital in calculating the contingent consideration, if any, payable to plaintiff. Section 10.1 permitted North Pacific to elect to treat certain funds it loaned to defendant after defendant acquired the business as Parent's Invested Capital. The parties agree that, had North Pacific made the election, plaintiff would not be entitled to any proceeds under Section 7.5, because the additional Parent's Invested Capital created by the election would have exceeded any remaining resale proceeds. However, Section 7.5 permitted the deduction of only Parent's Invested Capital existing "at the time of disposition" to Crescent. The problem for defendant, as explained below, is that North Pacific failed to elect to treat as Parent's Invested Capital, at or before the time it disposed of the business, the intercompany debt it now seeks to deduct in calculating the net proceeds of resale.

The contract expressly limits the amount defendant borrowed from North Pacific at the time of the original sale that could be treated as Parent's Invested Capital for purposes of Section 7. Section 7.1.1 provides, in part:

> " 'Parent's Invested Capital' shall mean the purchase price paid or payable by Buyer as set forth in Section 8, not including Contingent Consideration, *plus* the amount of debt repayment described in Section 1.4, *plus* any borrowings deemed to be additional Parent's Invested Capital pursuant to Section 10.1 * * *." (Emphasis in original.)

As noted, the purchase price paid under Section 8 was $224,405. Pursuant to Section 1.4, defendant paid $385,138 owed by plaintiff to one of its shareholders. Accordingly, at the time of the original sale, Parent's Invested Capital—as defined in Section 7.1.1—was $609,543.

Another step is required to calculate the total amount of Parent's Invested Capital, because Section 10.1 permitted North Pacific to elect to treat as additional Parent's Invested Capital certain loans that it made to defendant after defendant acquired the business. At the time of the resale to Crescent, defendant owed North Pacific $4,278,583. Even if that entire sum was loaned after the initial sale, however, it is undisputed that North Pacific did not elect—by the time of defendant's disposition of the business to Crescent— to treat any qualifying portion of that debt as Parent's Invested Capital, as required by Section 7.5. Therefore, defendant may deduct only $609,543 as Parent's Invested Capital in calculating any contingent consideration owed to plaintiff under Section 7.5.[8]

It is true that Section 7.5 provides for the deduction of Parent's Invested Capital *after* the net proceeds of sale are determined. Defendant argues that, irrespective of the amount of Parent's Invested Capital, it was entitled to deduct *all* debt the business owed in determining the net proceeds of sale.[9] We disagree. Section 7.1 limits the amount of *initial*

---

[8] In an affidavit opposing plaintiff's motion for summary judgment, North Pacific's "Senior Vice-President, Finance," acknowledged that, on the date of the sale to Crescent, Parent's Invested Capital remained at $609,543.

[9] Although defendant argues that it is entitled to deduct all debt it owed to all creditors, only the debt owed to North Pacific is at issue in this case. If defendant

intercompany debt that could be treated as Parent's Invested Capital. Moreover, Section 10.1 permits the treatment of *additional* intercompany debt as Parent's Invested Capital only if the leverage ratio exceeds a specified ratio in a given year. Defendant's argument that it could deduct all intercompany debt in calculating the net proceeds of sale thus is inconsistent with the qualifications for debt that originally constituted or later could be treated as Parent's Invested Capital. It makes no sense to infer that, although the parties created a detailed process for the initial treatment of Parent's Invested Capital and the later treatment of *some* additional intercompany debt as Parent's Invested Capital, defendant could, irrespective of that process, deduct *all* such debt in calculating the net proceeds of resale. If defendant were correct, a far simpler formula—namely, an explicit provision that any or all intercompany debt could be deducted from the proceeds of resale—would have sufficed.

Defendant next argues that, because North Pacific *could have* designated enough intercompany debt as Parent's Invested Capital to defeat plaintiff's claim, defendant may deduct the debt under Section 7.5, notwithstanding that North Pacific did not make the necessary election. Defendant asserts that North Pacific received no benefit from failing to make the election and that the contract should be interpreted as if the election had been made. However, the fact that North Pacific *could have* made such an election does not mean that defendant is entitled to deduct the debt in the absence of an election. Nor does the fact that defendant and North Pacific may have had no revealed—or obvious—business purpose in failing to make the election support rewriting the contract. Section 7.5 provides for the deduction of Parent's Invested Capital at the time of disposition of the business. To allow an untimely election to treat otherwise qualifying intercompany debt as Parent's Invested Capital would be contrary to the plain language of both Section 10.1 and Section 7.5.

Defendant also directs our attention to Section 7.1. If defendant had retained ownership of the business, Section

were entitled to deduct only that debt, plaintiff would not be entitled to recover here.

7.1 provides that plaintiff would have been entitled to a portion of defendant's after-tax annual net income in the five years following the sale, less certain deductions, including a portion of Parent's Invested Capital. Plaintiff would not have received a payment under Section 7.1 unless the business was profitable. Plaintiff argues that, unlike Section 7.1, Section 7.5 is not necessarily tied to the profitability of the business on an earnings basis. Thus, in plaintiff's view, its right to contingent consideration under Section 7.5 does not depend on whether it was entitled to compensation under Section 7.1 for any period preceding the resale. Defendant disagrees, asserting that Section 7.5 was intended to remunerate plaintiff for any future profits it would have received under Section 7.1 had a resale not occurred. Defendant argues that the profitability requirement of Section 7.1 demonstrates that plaintiff is not entitled to any contingent consideration under Section 7.5 unless the business was sold for a gain *after* the repayment of intercompany debt.

We conclude that defendant's argument is not plausible. Under defendant's view, we must *imply* into Section 7.5 an additional condition of contingent consideration that the business must be sold for a gain. Although Section 7.1 requires that the business be profitable before plaintiff is entitled to compensation under that provision, Section 7.5 contains no such requirement. Instead, the latter provision employs an altogether distinct formula for determining the consideration, if any, owed to plaintiff following the resale of the business. Nor is there any purpose evident in Section 7.1 that necessarily would limit plaintiff's contingent consideration to any gain defendant received in the event of a resale of the business. In short, Section 7.1 does not support defendant's interpretation of Section 7.5.

Ultimately, the meaning of "net proceeds" is unambiguous in light of the contract as a whole. The net proceeds of sale consisted of the purchase price paid by Crescent, minus the costs related to the sale upon which the parties agree. The intercompany debt that defendant owed to North Pacific was deductible under Section 7.5 only to the extent that it both qualified *and* actually was treated by North Pacific as Parent's Invested Capital in accordance with the requirements of that section. Although defendant points to

extrinsic evidence that, it argues, supports a different interpretation, we may not use extrinsic evidence to alter the unambiguous terms of a contract. *Goodman v. Continental Casualty Co.*, 141 Or App 379, 389, 918 P2d 438, *rev den* 324 Or 305 (1996) ("[C]ourts can resort to such extrinsic evidence in construing contracts only if contractual language is ambiguous."). The trial court correctly granted summary judgment to plaintiff and correctly denied defendant's motion for summary judgment.[10]

Affirmed.

---

[10] Because we end our analysis at the first level of construction, we have not relied on extrinsic evidence in the summary judgment record. Accordingly, we need not address plaintiff's cross-assignment of error that the trial court erred in denying its motion to strike some of that evidence.